[Cite as *In re T.P.*, 2015-Ohio-3679.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102705**

# IN RE: T.P.
# A Minor Child

[Appeal By Mother]

## JUDGMENT:
### AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD14901761

**BEFORE:** McCormack, J., Keough, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 10, 2015

**ATTORNEY FOR APPELLANT**

Dale M. Hartman
2195 South Green Road
Cleveland, OH 44121


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By:   Rachel V. Eisenberg
Assistant Prosecuting Attorney
3955 Euclid Avenue
Cleveland, OH 44115

TIM McCORMACK, J.:

**{¶1}** Appellant mother ("mother" hereafter) appeals from the judgment of the juvenile court granting permanent custody of her child T.P. to the Cuyahoga County Division of Child and Family Services ("CCDCFS" or "agency" hereafter). After a thorough review of the record and applicable law, we affirm the juvenile court's judgment.

### Substantive History and Procedural Background

**{¶2}** Mother has two older children: a girl, J.P., six years old at the time of the permanent custody trial, and a boy, Q.H., two years old. J.P. was adjudicated neglected and placed in the temporary custody of the agency in 2010. After mother completed her case plan, she was reunited with J.P.

**{¶3}** In June 2013, mother was living with her boyfriend Kevin Price. On June 10, 2013, Q.H. was taken to the emergency room and found to have sustained extensive and serious injuries. Daughter J.P. was also found to have bruising on her body, but the injuries were not as severe.[1]

**{¶4}** Price was subsequently convicted of abusing Q.H. and received a five-year prison term for his conviction. Mother herself pleaded guilty to, and was convicted of,

---

[1]Mother stipulated to an amended complaint in the instant case regarding the injuries found on her children. She stipulated that on June 10, 2013, her son Q.H. was hospitalized due to bruises on his right abdomen, chest, and spine, and abrasions behind his right ear, left neck, and flank/back; her daughter J.P. had bruising on her leg, back, and neck.

two counts of child endangerment and one count of permitting child abuse. She served some time in the county jail for her offenses.

{¶5} Both J.P. and Q.H. were removed from mother. J.P. was placed in the legal custody of her father. Q.H. was in the temporary custody of the CCDCFS, and a motion relating to his permanent custody was pending.

{¶6} Mother was released from jail in October 2013. Four months later, in February 2014, T.P. was born. Price is the father. The agency immediately took emergency custody of the baby. The trial court granted emergency custody to the agency, and T.P. was placed in a foster home, the foster home where his brother Q.H. was also staying. T.P. was subsequently found to be dependent. In May 2014, temporary custody of the child was granted to the agency. A case plan was then provided for mother to address her basic needs, mental health, and any substance abuse issues.

{¶7} In June 2014, the agency filed a motion for permanent custody. Thereafter, mother filed a motion for legal custody. On January 30, 2015, the court held a permanent custody hearing.

### Testimony on Behalf of CCDCFS

{¶8} The social worker in this case, Tracy Simpkins-Smith, testified that the oldest child, J.P., was in the agency's custody twice. On the first occasion, mother was seen pulling J.P. down the hallway by her hair. Although mother was eventually reunited with her daughter after completing her case plan, the agency regained J.P.'s custody in the summer of 2013 when both J.P. and her brother Q.H. were found with

injuries. Q.H.'s injuries were severe. He was lethargic and had not been fed for 24 hours. It was mother's mother (Q.H.'s grandmother), not mother, who took Q.H. to the emergency room. Q.H. was found to have suffered broken ribs, a lacerated liver, choke marks around his neck, and bruises behind his ears. When questioned about the injuries, mother insisted she did not know what happened. Her daughter J.P. was found with bruising on her upper thighs, the back of her thighs, and her back, as well as bruising behind her ears and behind her neck. J.P. indicated her mother "whooped" her. J.P. also stated that "every time the baby cries, Kevin [Price] punches the baby in the stomach."

{¶9} The social worker testified that, after mother was released from jail in October 2013, she was compliant with her probation. After staying in shelters for some time, she was able to obtain housing and employment, although she changed employment several times.

{¶10} Regarding the progress on mother's case plan, the social worker testified that, when attending a domestic violence class, mother was observed to put her head down and talk on her cell phone in class. Because she did not appear to benefit from the domestic violence program, mother was requested by the court to retake the class, although another suitable class was not available.

{¶11} Regarding mother's mental health, the social worker testified mother did not adequately address the abuse of her children or her emotional volatility. She continued to downplay her role in the abuse of her children. Individual counseling was provided

for her to understand why she was aggressive toward her children and others, but she failed to attend counseling regularly.

{¶12} Regarding substance abuse issues, the social worker testified that although the mother's alcohol and marijuana use was noted in J.P.'s case history, mother would not admit to any substance abuse. She tested positive for cocaine several months before T.P. was born. She has since tested negative.

{¶13} Mother consistently visited with T.P. and Q.H. at an agency building. She played well with them and brought them food, clothes, and toys, but she was not always attentive to them. The social worker also felt mother's behavior was not always appropriate. Mother's moods were volatile in her interaction with the social worker. In one such visit, she argued with the social worker and turned verbally abusive in front of the children. The social worker had to call security.

{¶14} Most notably, the social worker testified that mother continued to deny any responsibility for the abuse suffered by her six-year-old daughter and two-year-old son. She acknowledged neither abusing her children nor failing to protect them from abuse. She denied seeing any injuries on her son Q.H. before he was taken to the hospital, even though she had just given him a bath and changed his diaper. Despite her prior participation in the case plan services relating to J.P.'s custody case, she failed to protect her son Q.H. from abuse.

**{¶15}** As to a placement with relatives, the social worker testified that the agency made efforts to find placement among various relatives suggested by mother, but no suitable placement could be found.

**{¶16}** J.P.'s father's grandmother, A.D., also testified for the agency. She helped care for J.P. after both J.P. and her brother Q.H. sustained injuries in the summer of 2013 and were consequently removed from their home. A.D. saw whip marks on J.P.'s thighs, buttock, and back. J.P. told her that her mother "whooped" her. A.D. continued to care for J.P. when her grandson (J.P.'s father) was given legal custody of J.P. She testified that although J.P. and her mother have a good relationship, she would not trust mother enough to leave J.P. in unsupervised visits with her because of her mood issues.

**{¶17}** Mendi Joi Wilson, mother's counselor from Corrections, a community health agency, also testified for CCDCFS. Wilson began counseling mother in August 2014 and worked with mother on her coping skills. The counseling was supposed to be twice a month but mother only attended it once a month. Mother was emotionally unstable initially because of the removal of her children. Mother acknowledged she had a conviction for child endangerment but attributed the situation to her being a victim of domestic violence herself. Because mother did not acknowledge her own inappropriate conduct, the issue of her behavior toward her children was never addressed. The counselor did note that mother has become more positive and happier, as she was able to work steadily and to furnish her apartment.

## Witnesses on Behalf of Mother

{¶18} Mother presented the testimony from Mary Nichols, an employee at Jordan Community Resources Residential Center, a temporary shelter for women. Nichols considered herself as mother's mentor. She testified that mother complied with her case plan in the hope of being reunited with her children. By the time mother moved out of the facility into her own housing in June 2014, she had shown "tremendous growth." As to the abuse of her son, Q.H., mother regretted what happened to her children, but felt what happened was "beyond her control."

{¶19} Mother herself testified. She was combative and argumentative at times on the witness stand. She testified that, while in the county jail, she participated in the Moms First program and learned to be aware of the power struggle between parents and children and how to deal with it. She denied ever using cocaine, although a December 2013 test showed positive for cocaine. She denied ever abusing her children and continued to insist that she was unaware they were being abused. She testified that on the day Q.H. was taken to the emergency room, she had been at work all day. When she returned home from work, Q.H. was lying down. Her mother stopped by and, noticing that something was very wrong with Q.H., urged her to seek medical attention for Q.H. Mother, however, insisted Q.H. was "perfectly fine" when she left for work that morning.[2] When her mother persisted, mother finally permitted her mother to take Q.H.

_____

[2]Mother testified as follows regarding the circumstances surrounding Q.H.'s trip to the emergency room:

to the emergency room. As to her own conviction of child endangerment, she insisted she did not know that her boyfriend abused Q.H. Although Q.H. showed bruises on his stomach and broken ribs in various stages of healing, she testified that when she changed his diaper that day, she did not see any bruises. She, inexplicably, maintained that the bruises appeared between the time the child left for the hospital and when the medical personnel examined him.[3] She acknowledged the abuse of her children only in the sense

---

[I]t's kind of warm outside. We're all sitting on the patio and I'm trying to feed [Q.H.], and he did not want to eat at all. So my mom, she's like, my intuition is telling me something is wrong with my grandson. He feels like he has a fever.

So usually my mom just — for me, I'll just — she's a mom. She's just always trying to diagnose somebody with something. She thinks she's a doctor. So I'm like, there's nothing wrong with him. She's like, there is something seriously wrong with my grandson. So I'm like, okay. Well, if you feel there's something wrong with him, then you take him to the emergency room because he was perfectly fine when I left this morning.

[3]The transcript reflects the following exchanges between the GAL and mother:

[GAL]: Are you saying that the bruises appeared between the time —
[mother]: Yes.
[GAL]: [Q.H.] left your house and got to the hospital?
[mother]: The bruises appeared by the time that they fully laid him down. By the time they took off his clothes, yes, the bruises appeared on his body.
[GAL]: He had multiple bruises. He had bruises other places on his stomach. You did not see them when you changed him?
[mother]: No, I did not.
GAL]: He also had broken ribs in various stages of healing. Did you ever see a bruise on your son's body when you bathed him or changed him or dressed him?
[mother]: My son has never indicated to me that he was hurting. If my son would have showed me like any type of wince, I would have checked my son. You're asking me as if I — okay. I admitted that I failed to protect my children, but I'm not going to sit up here and let you say

that she had allowed her children to witness her boyfriend's abusive conduct toward her.

|  |  |
|---|---|
|  | that I failed to make sure my kids were — they had their immunization or that – I didn't fail for him to get to the emergency room because I gave my mother permission to take him. |
| [GAL]: | I'm not talking about immunization. I'm talking about your son who had broken ribs in multiple stages of healing when he went to the hospital. He had bruises, and you're telling me that you never – |
| [mother]: | I'm telling you |
| [GAL]: | — noticed a single bruise on your child? |
| [mother]: | Have you seen any bruises on his ribs? Have you seen — did they take any pictures? Okay. So you're shaking your head, — Tracy [addressing the social worker]. Where are the pictures? |
| [GAL]: | I have read all the medical reports. |
| [mother]: | No. Did you see? |
| [GAL]: | okay. |
| * * * | |
| [GAL]: | I'm a little bit confused by some of your testimony. You said that you didn't know that your children were abused, and about a minute later you said you take full responsibility because you know they were abused. Which one of those two is it? |
| [mother]: | You are trying to manipulate my mind. I just said that now that I have knowledge of knowing through my domestic violence that children watching someone be abused, that is abuse. That's what I just said. I did not know my son was harmed. But now that I know through my domestic violence classes and paying attention and actually looking up on it, that children seeing that is still abuse. |

## GAL's Report and Trial Testimony

{¶20} The GAL for T.P., who is also the GAL for mother's two other children, filed a report and recommended permanent custody. She reported that mother faced the same substance abuse and anger issues in the instant custody matter as she did in the prior custody cases, yet would not take responsibility for her actions. Mother's moods fluctuated — calm and cooperative at one meeting but angry and confrontational at next. During a supervised visit before Christmas 2014, mother was so verbally abusive and aggressive toward the social worker that security had to be called. Mother tended to blame everyone else for her situations. She claimed she was unaware Q.H. was being abused, although the injuries should have been visible when she changed his diaper, or when she bathed or dressed him. Although Q.H. appeared to be ill, she did not take Q.H. to the hospital herself. Despite a completion of her case plan, she failed to actively engage in the available services to address her issues. Mother took a domestic violence class, but was observed to be inattentive in the class. Mother started individual psychological counseling but has not regularly attended the sessions.

{¶21} As to T.P., the GAL noted that T.P. has been in the same foster family with his brother Q.H. since he was born. The foster family reported T.P. to be a healthy and happy baby, his development right on target. The brothers were close. T.P. was fond of his brother, and Q.H. was very good with T.P. The GAL recommended in her report that it was in the best interest of T.P. to be placed in the permanent custody of CCDCFS.

**{¶22}** At trial, the GAL testified that she believed mother has not benefitted from her domestic violence class. Her review of the report of mother's counseling records similarly did not indicate mother had accepted responsibility for her actions but instead blamed her situation on others. The GAL opined that it was in the best interest of T.P. for him to be placed in the agency's permanent custody.

**{¶23}** Upon consideration of the trial testimony and the GAL's report, the trial court found clear and convincing evidence for the agency to be granted permanent custody. The court found that the child cannot be placed with his parent within a reasonable time or should not be placed with the parent. The court also found permanent custody is in the best interest of the child after a consideration of the pertinent statutory factors.

**{¶24}** On appeal, mother assigns a single assignment of error. She contends that the granting of permanent custody was against the manifest weight.

**{¶25}** We begin with the recognition that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). While we have emphasized that the "termination of the rights of a birth parent is an alternative of last resort," *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21, we are also mindful that "[a]ll children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

## Two-Part Analysis for Permanent Custody

{¶26} R.C. 2151.414 sets forth a two-part analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). It authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child, and, (2) *any* of the four factors apply: the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); the child is abandoned (R.C. 2151.414(B)(1)(b)); the child is orphaned, and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); or, when none of the above three factors applies but "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." (R.C. 2151.414(B)(1)(a)).

{¶27} T.P. has not been in the agency's custody for twelve months of a consecutive 22-month period, or abandoned or orphaned. The agency moved for custody on the ground of R.C. 2151.414(B)(1)(a): "whether the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."[4]

---

[4]The agency filed the motion for permanent custody before the child has been in the agency's temporary custody for 12 months. This is permitted when the ground for permanent custody is *not* R.C. 2151.414(B)(1)(d) (the child has been in the custody of an agency for 12 out of a consecutive 22-month period). *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176. The Supreme Court of Ohio explained that R.C. 2151.413, which governs the filing of a permanent

{¶28} In order to find the existence of this factor, the trial court is to consider 16 enumerated factors under R.C. 2151.414(E). These factors include, among others, whether the parent failed continuously and repeatedly to substantially remedy the conditions that had caused the removal of the child (R.C. 2151.414(E)(1)); whether the parent is incarcerated for an offense committed against the child or a sibling (R.C. 2151.414(E)(5)); whether a parent has been convicted of or pleaded guilty to a child-abuse related offense against the child or a sibling and the parent poses an ongoing danger to the child or a sibling (R.C. 2151.414E(6)); whether the parent has committed abuse or allowed the child to suffer neglect and the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a

---

custody motion, was a *permissive* statute prior to H.B. 484 amendments, and it set forth only situations in which the agency *could* file for permanent custody. After H.B. 484's amendments, an agency *must*, except in limited circumstances, file for permanent custody once a child has been in the agency's temporary custody for 12 of a consecutive 22-month period. *Id.* at ¶ 20. In addition, H.B. 484 added the "12/22" provision to R.C. 2151.414 so that an agency no longer needs to prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents, so long as the child has been in the temporary custody for 12 months. *Id.* at ¶ 21. The *C.W.* court held that if the agency moved for permanent custody on R.C. 2151.414(B)(1)(d) grounds ("12/22"), the child must have been in the agency's temporary custody for 12 months out of a consecutive 22-month period. *Id.* at ¶ 26. However, an agency can move for custody before a child has been in the agency's temporary custody for 12 moths, if a ground other than R.C. 2151.414(B)(1)(d) exists to support a grant or permanent custody. *Id.* at ¶ 27. In the instant case, the agency filed for T.P.'s permanent custody on the grounds of R.C. 2151.414(B)(1)(a) ("cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents"); therefore, the agency did not have to wait for the expiration of the 12-month period before filing for permanent custody. In *In re Baby Boy M.*, 8th Dist. Cuyahoga No. 91312, 2008-Ohio-521, ¶ 23, the mother claimed the agency failed to wait the 12-month period before moving for permanent custody. This court, applying *C.W.*, held that the agency was not required to wait 12 months before filing its motion for permanent custody when the ground for permanent custody is not R.C. 2151.414(B)(1)(d) ("12/22") but R.C. 2151.414(B)(1)(a), as in the instant case.

threat to the child's safety R.C. 2151.414(E)(15). The statute also permits the court to consider "any other factor the court considers relevant." R.C. 2151.414(E)(16).

{¶29} Only one of the enumerated factors under R.C. 2151.414(E) is required to exist for the court to make the finding that "the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000); *In re R.M.*, 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14 (the existence of only one factor will support the court's finding that the child cannot be reunified with the parent within a reasonable time).

{¶30} In fact, once the court has properly determined that one of the enumerated factors exist, it is mandated to enter a finding that the child cannot or should not be placed with either of his parents within a reasonable period of time *In re Hauserman*, 8th Dist. Cuyahoga No. 75831, 2000 Ohio App. LEXIS 338, *12 (Feb. 3, 2000), citing *In re Shanequa H.*, 109 Ohio App.3d 142 (6th Dist.1996). As this court explained in *In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379 (July 27, 2000), "'[t]he clear import of R.C. 2151.414(E) is that it is mandatory on the court to decide that a child cannot be placed with his parent when any of the * * * conditions exist as to the parent. The intent of the legislature was to eliminate any discretion on the part of the court when one of the conditions exists.'" *Id.*, quoting *In re Higby*, 81 Ohio App.3d 466, 469, 611 N.E.2d 403 (9th Dist.1992).

**{¶31}** Under the two-tier analysis, once the court determines that one of the four factors listed in R.C. 2151.414(B)(1) is present, the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including, but not limited to, the following:

    (a)    The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

    (b)    The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

    (c)    The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

    (d)    The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

    (e)    Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶32}** To grant permanent custody, therefore, the juvenile court is required to find, by clear and convincing evidence, that one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(d) exists, and an award of permanent custody is in the best interest of the child.

**{¶33}** Applying the two-part analysis in this case, because the child is not abandoned or orphaned, and the child has not been in the temporary custody of the agency

for 12 or more months, the trial court may grant permanent custody if it determines by clear and convincing evidence that (1) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, and (2) permanent custody is in the best interests of the child. *In re Hauserman*, 8th Dist. Cuyahoga No. 75831, 2000 Ohio App. LEXIS 338, *19.

{¶34} Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt. *In re Parsons*, 9th Dist. Lorain Nos. 97CA006662 and 97CA006663, 1997 Ohio App. LEXIS 5141 (Nov. 12, 1997).

{¶35} As for our own role on appeal from the trial court's decision, we are cognizant that a juvenile court's termination of parental rights and award of permanent custody to an agency is not reversed unless the judgment is not supported by clear and convincing evidence. *In re: Dylan C.*, 121 Ohio App.3d 115, 121, 699 N.E.2d 107 (6th Dist.1997).

### Clear and Convincing Evidence Supports Permanent Custody

{¶36} Here, under the first part of the permanent custody analysis, the court found the existence of the R.C. 2151.414(B)(1)(a) factor — the child cannot be placed with

either parent within a reasonable time or should not be placed with the parents. Although only one of the 16 enumerated factors in R.C. 2151.414(E) need to exist to support that finding, the court made multiple findings under the statute.

{¶37} The court found that despite reasonable case planning and diligent efforts by the agency, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child's removal (R.C. 2151.414(E)(1)); the child's father was incarcerated for an offense committed against a sibling of the child (R.C. 2151.414(E)(5)); the mother was convicted of or pleaded guilty to an offense involving the same sibling (R.C. 2151.414(E)(6)); the child's father was incarcerated at the time of the filing of the permanent custody motion and will not be available for 18 months after the filing (R.C. 2151.414(E)(12); and mother has allowed the child's siblings to suffer neglect and the seriousness, nature, or the likelihood of recurrence of the abuse or neglect made the placement of the child with mother a threat to his safety (R.C. 2151.414(E)(15) and (16)).[5]

{¶38} Our review indicates that the finding that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents is supported by the record. T.P.'s father is still incarcerated for abusing him. Although

---

[5]We note that the factor enumerated in R.C. 2151.414(E)(15) states that "[t]he parent has committed abuse * * * against the *child* or caused or allowed the *child* to suffer neglect * * *, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety." (Emphasis added.) The trial court's finding of neglect related to the *siblings* instead. As we have pointed out earlier, however, section (E)(16) of the statute permits the trial court to consider any factor the court deems relevant.

mother completed her case plan, a completion of the case plan is not, in itself, conclusively dispositive on the issue of reunification and does not preclude a grant of permanent custody to a social services agency. *In re C.C.*, 187 Ohio App.3d 365, 2010-Ohio-780, 932 N.E.2d 360, ¶ 25 (8th Dist.). Despite her attendance in the case plan services, which included individual psychological counseling, she did not appear to benefit from comprehensive attempts at counseling, as concluded by the social worker, the GAL, and the trial court and also reflected by our independent review of her trial testimony. The trial court noted mother's lack of emotional stability — she continued to exhibit mood volatility and aggressive interactions with others in front of her children during the visitations. More importantly, because she would not acknowledge her own dangerously deficient conduct, the issue of her behavior toward her children was never addressed in the counseling sessions. Significantly, she only acknowledged the abuse suffered by her children in the sense that she allowed them to witness her boyfriend's (T.P.'s father) abusive conduct toward her. She still denied her own role in the extensive injuries suffered by Q.H., lacking any appreciation of the fact that her failure to protect Q.H. contributed to the abuse he had suffered. Her failure to substantially remedy the condition that had caused T.P.'s removal, her conviction of child endangerment relating to a sibling, and the nature and the seriousness of her past neglect making the placement with her a threat to T.P.'s safety, all support the finding that the child cannot be placed with her within a reasonable time or should not be placed with her.

**{¶39}** There is, therefore, clear and convincing evidence on the record warranting a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.

**{¶40}** As to the second part of the permanent custody analysis, the trial court, noting all pertinent statutory factors pursuant to R.C. 2151.414(D)(1) and citing the GAL's report, found it was in the best interest of T.P. for his permanent custody to be granted to CCDCFS.

**{¶41}** Our review of the record also reflects clear and convincing evidence in support of the trial court's finding regarding the best interest of the child. Although mother and the child appeared to have a good relationship during the visitations, mother exposed the child to her emotional instability and aggressive conduct with others (R.C. 2151.414(D)(1)(a)). The child's wishes, as expressed through his GAL, favored permanent custody (R.C. 2151.414(D)(1)(b)). The child has been in the agency's custody since he was a few days old and was never returned to the custody of mother during the entire pendency of the case (R.C. 2151.414(D)(1)(c)). There are no other suitable relatives available to place the child, and therefore, the child's need for a legally secure permanent placement cannot be achieved without a granting of permanent custody to the agency (R.C. 2151.414(D)(1)(d)).

**{¶42}** Our review of the record shows the juvenile court's judgment granting permanent custody of T.P. is supported by clear and convincing evidence. Recognizing

our limited role on appeal in permanent custody cases, we affirm the juvenile court's judgment.

**{¶43}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the juvenile court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
TIM McCORMACK, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EILEEN A. GALLAGHER, J., CONCUR