[Cite as *In re Baby Boy N.*, 2021-Ohio-1272.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 20AP-440 |
| Baby Boy N., | : | (C.P.C. No. 18JU-11997) |
| (H.B., | : | (REGULAR CALENDAR) |
| Appellant). | : | |

---

## D E C I S I O N

Rendered on April 13, 2021

---

**On brief:** *Harris Law Firm, LLC,* and *Felice Harris,* for appellant.

**On brief:** *Robert J. McClaren,* for appellee Franklin County Children Services.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, J.

{¶ 1} H.B., the alleged father of Baby Boy N., appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion for permanent custody filed by Franklin County Children Services ("FCCS"). For the following reasons, we affirm the trial court's judgment.

### I. Factual and Procedural Background

{¶ 2} On October 12, 2018, FCCS filed a complaint under R.C. 2151.353 alleging that Baby Boy N. was an abused, neglected, and dependent child. The complaint alleged that Baby Boy N., born two weeks prior, had "tested positive for oxycodone and amphetamines at birth," had "suffered from withdrawals and required additional treatment" afterwards, and that Mother C.N. "admitted to alcohol, marijuana, methamphetamine and oxycodone use during her pregnancy." (Oct. 12, 2018 Compl. at 1.)

C.N. claimed "that she had no knowledge of her pregnancy until approximately one month prior to giving birth," that "she was in no position to provide for Baby Boy and that her plan was to leave the hospital as soon as possible without" him. *Id.* Although C.N. initially identified H.B. as the alleged father, she "later reported * * * that he could not be the Father of Baby Boy, as she had only known [him]" for six months before the birth. *Id.*

{¶ 3} The magistrate granted emergency custody to FCCS on October 12, 2018. After a preliminary hearing, the magistrate granted temporary custody to FCCS on October 15, 2018.

{¶ 4} At a hearing held on November 16, 2018, C.N. and H.B. were present and were served with the complaint. C.N. testified that she "believe[d]" that H.B. was the father of Baby Boy N. (Nov. 16, 2018 Tr. at 5.) H.B. also testified. When asked if he thought that he was Baby Boy N.'s father, he replied: "I believe so," but clarified that he had "had no knowledge" of the pregnancy and first heard about the birth when he "got a ticket" and was told he that he owed child support. (Tr. at 9.)

{¶ 5} After a hearing held on January 7, 2019, at which the matter was uncontested, the magistrate adjudicated Baby Boy N. abused, neglected, and dependent. (Jan. 11, 2019 Mag.'s Decision.) In the FCCS case plan integrated into the adjudication order, one express goal was determining and establishing the paternity of Baby Boy N. (Jan. 10, 2019 Case Plan at 7.) The semi-annual review of May 28, 2019 identified H.B. as Baby Boy N.'s "alleged father," but stated that "[p]aternity still needs established." (May 28, 2019 Semi-annual Review at 4.) During a visit with the caseworker on March 14, 2019, H.B. stated that he was "not interested in taking placement" of the child. *Id.*

{¶ 6} FCCS filed a motion for permanent custody of Baby Boy N. on August 22, 2019. Another semi-annal review of the FCCS case plan was filed on October 25, 2019. It reported that H.B. attended the review but had "not established paternity and the caseworker provided him again with the information that he needs to go complete testing." (Oct. 25, 2019 Semi-annual Review at 4.)

{¶ 7} The magistrate issued findings of fact and conclusions of law on February 20, 2020 "regarding the reasonable efforts made by [FCCS] to implement a permanency plan" in accordance with R.C. 2151.417. (Feb. 20, 2020 Findings of Fact & Conclusions of Law.) The magistrate noted that FCCS had received temporary custody of Baby Boy N. on

January 7, 2019, at which time "a case plan was approved." *Id.* The magistrate also stated that Baby Boy N. had "been in the custody of [FCCS] for twelve out of twenty-two months" and that the agency had moved for permanent custody. *Id.* The magistrate concluded that FCCS had "made reasonable efforts to finalize a permanency plan." *Id.*

{¶ 8} The magistrate held a hearing on the motion for permanent custody on February 20, 2020, with appearances by the attorney for FCCS, Baby Boy N.'s guardian ad litem, an attorney representing H.B., and the FCCS caseworker assigned to Baby Boy N.'s case. Mother C.N. was not present. H.B. was incarcerated and not present.

{¶ 9} H.B.'s attorney informed the magistrate that although his client was serving a seven-year prison term, and against the advice of counsel, H.B. chose to contest the motion. (Feb. 20, 2020 Tr. at 3-4.) The "biggest issue" H.B. had, according to his attorney, was his belief that "he never received proper, specific instructions" on how to establish paternity, as mandated by the case plan. (Tr. at 5-6.) H.B.'s attorney also informed the magistrate that H.B.'s mother intended "to seek legal counsel and move to intervene as a party to seek custody" and was present with the intention of addressing the court. (Tr. at 8.)

{¶ 10} FCCS called two witnesses to provide testimony in support of the motion for permanent custody. Maggie Zych, an FCCS caseworker, testified that the agency had been informed the day after Baby Boy N.'s birth that he had tested positive for oxycodone and amphetamines and that his mother was "unwilling" to take him home with her from the hospital or "to set up an adoption plan for him." (Tr. at 20.) Upon his discharge, FCCS placed the baby in a foster home where he has lived continuously, and the parents were "strongly interested in adopting him." *Id.* C.N. never complied with any requirement of the case plan and "consistently" said that "she didn't want to participate" whenever she spoke with Ms. Zych. (Tr. at 23.) Neither C.N. nor H.B. had ever "had any visitation or contact" with Baby Boy N. (Tr. at 24.)

{¶ 11} Ms. Zych testified initially C.N. refused to "provide any information whatsoever" about the baby's father. (Tr. at 24.) C.N. eventually relented and provided H.B.'s contact information in December 2018. *Id.* Ms. Zych met with H.B. four times between March and September 2019 "regarding paternity" and stated she "spoke to him about it at each contact." (Tr. at 25.) After consulting with an FCCS attorney, she emailed

C.N. with the "specific steps [that] needed to be taken," including signing a paternity affidavit at the health department or the Child Support Enforcement Agency. *Id.* However, "[n]either were willing to do that. They wanted to [have] an actual test." *Id.* Ms. Zych told them "to open a case" with the Child Support Enforcement Agency ("CSEA") and she "provided that information in person on May 29th to both parents," but there was "no progress." (Tr. at 26.) Ms. Zych was not able to get into contact with H.B. again until September 30, 2019 at which time he expressed that "he didn't understand" the information, so she "gave [him] the same exact information again." *Id.* Her supervisor provided H.B. with the information again on October 4, 2019. *Id.* In spite of these efforts, paternity was never established. (Tr. at 27.)

{¶ 12} Ms. Zych also testified that no maternal relatives were willing to take placement of Baby Boy N., H.B. expressed that "he couldn't take the child but would like to establish paternity," and that his mother was not willing to allow a home study "until paternity was established." (Tr. at 28.) According to her observations, Baby Boy N. was "very bonded" with his foster parents, who are "the only parents he knows." (Tr. at 29.) There had been no contact between C.N. or H.B. and the child, as H.B. "didn't want contact until paternity was established." *Id.*

{¶ 13} The guardian ad litem, Don Kline, testified that Baby Boy N. was "in a very loving home with foster parents that are able to adopt," had "known no one but them," and was "very well bonded" to the foster parents. (Tr. at 56.) Mr. Kline also stated at a previous hearing, he spoke with H.B. and told "him that he needed to go right across the street * * * that day, to go to 80 East Fulton Street and get his DNA [test] done and be done with it." *Id.* Mr. Kline reiterated this request to H.B. at another hearing date as well. (Tr. at 57-58.) He recommended granting the motion for permanent custody "due to the fact that mother and father have done absolutely zero as far [as] any case plan objectives and they have never even seen this child." (Tr. at 60.)

{¶ 14} After FCCS rested its case, H.B.'s mother stood up and attempted to address the court to "express [her] concern" about Baby Boy N. She accused C.N. of lying and telling her that "the baby died," and stated she wanted "paternity established" so the child could "be with" her. (Tr. at 62-63.) H.B.'s attorney objected to the magistrate not allowing her to be called as a witness. (Tr. at 66.)

{¶ 15} Effective February 20, 2020, the magistrate granted the motion for permanent custody, ruling that it was "in the best interest of Baby Boy [N.] to terminate the parental rights of" C.N. and H.B. (Mar. 3, 2020 Mag.'s Decision at 3.)

{¶ 16} H.B. objected to the magistrate's decision on two grounds. First, he objected to the magistrate's denial of his counsel's request "to call his mother (paternal grandmother) as a witness" at the hearing. (Mar. 19, 2020 Objs. at 2.) Second, he objected that "[t]he Magistrate's ruling was against the manifest weight of the evidence. As example, the evidence failed to demonstrate that [FCCS] had made reasonable efforts in assisting Father to complete his task plan goals, specifically in the goal of having father establish paternity." *Id.*

{¶ 17} The trial court overruled H.B.'s objections and adopted the magistrate's decision in its entirety. (Sept. 3. 2020 Decision & Jgmt. Entry.) The trial court overruled H.B.'s objection to the magistrate not allowing his attorney to call his mother as a witness, finding that "the magistrate acted within his authority to deny [the] witness to regulate the proceeding" after her outburst. (Decision & Jgmt. Entry at 5.) The trial court stated that she appeared to be "arguing for the custody of the minor child for herself," yet had taken no steps to be added as a party to the case. *Id.*

{¶ 18} The trial court rejected H.B.'s second objection on two grounds. First, it noted that H.B.'s invocation of the "manifest weight of the evidence" standard was "improper" when reviewing a magistrate's decision. (Decision & Jgmt. Entry at 5-6.) Thus, the trial court "conduct[ed] and independent analysis" of the record and found no error in the magistrate's decision to terminate the parties' parental rights. (Decision & Jgmt. Entry at 6.) Second, after recounting the caseworker's efforts to assist H.B. with establishing paternity, it rejected the contention that FCCS did not fail to make reasonable efforts at reunification. (Decision & Jgmt. Entry at 7.)

{¶ 19} H.B. has appealed and asserts the following assignments of error:

> [I.] The trial court's decision granting permanent custody to Franklin County Children Services is against the manifest weight of the evidence.
>
> [II.] The trial court abused its discretion in denying trial counsel's request to call Ms. Johnson as a witness.

[III.] H.B.'s right to the effective assistance of counsel was violated when counsel's performance fell below an objectively reasonable standard and his deficient performance resulted in prejudice.

## II. Standard of Review

{¶ 20} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. Under the manifest weight of the evidence standard, the court of appeals "will not overturn a permanent custody order when it is supported by competent, credible evidence." (Citations omitted.) *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 51. The reviewing court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13. In addition, we "generally review a trial court's adoption, denial or modification of a magistrate's decision for an abuse of discretion." *Brunetto v. Curtis*, 10th Dist. No. 10AP-799, 2011-Ohio-1610, ¶ 10.

## III. Analysis

{¶ 21} H.B. presents four arguments in support of the first assignment of error challenging the trial court's decision to grant the motion for permanent custody. First, he argues that the trial court erroneously overlooked findings of fact issued by the magistrate when it stated: "The record is devoid of a request for finding of fact and conclusions of law from the magistrate Juv.R. 40(D)(3)(a)(ii)." (Appellant's Brief at 17.) Citing the February 20, 2020 Findings of Fact and Conclusions of Law, H.B. argues that the trial court's statement was "against the manifest weight of the evidence." (Appellant's brief at 18.)

{¶ 22} Our review of the record confirms that the trial court's observation was correct. No party requested findings of fact and conclusions of law under Juv.R. 40(D)(3)(a)(ii), which states that "a magistrate's decision may be general unless findings of fact and conclusions of law are timely requested by a party or otherwise required by law." The February 20, 2020 findings of fact cited by H.B. specifically reference the magistrate's responsibility to review the permanency plan under R.C. 2151.417: "Pursuant to section 2151.417 of the Revised Code, the Court hereby makes the following Findings of

Fact regarding the reasonable efforts made by [FCCS] to implement a permanency plan." *See* R.C. 2151.417(A) (stating that "[a]ny court that issues a dispositional order" finding a child abused, neglected or dependent "may review at any time * * * the child's permanency plan if the child's permanency plan has been approved, and any other aspects of the child's placement or custody arrangement"). The magistrate's findings may have been "otherwise required by law," as allowed by Juv.R. 40(D)(3)(a)(ii), but they were not responsive to a request by any party. In addition, no party requested findings of fact or conclusions of law after the entry of the magistrate's March 3, 2020 decision terminating C.N.'s and H.B.'s parental rights. The record confirms the trial court's observation on this issue.

{¶ 23} H.B.'s second argument is that the magistrate's finding in the February 20, 2020 Findings of Fact and Conclusions of Law that "Baby Boy [N.] has been in the custody of Children Services for twelve out of twenty-two months" was against the manifest weight of the evidence because Baby Boy N. had only been in FCCS's temporary custody for ten months at the time the agency filed the motion for permanent custody. (Feb. 20, 2020 Findings of Fact and Conclusions of Law; Appellant's Brief at 19-20.)

{¶ 24} H.B. did not object to this finding in the trial court and cannot challenge it on appeal. "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." Juv.R. 40(D)(3)(b)(iv). H.B. does not claim plain error with regard to this finding. In fact, he concedes that "FCCS did not move for permanent custody on the grounds that B.B.N. was in the temporary custody of the agency for at least 12 months of a consecutive 22-month period." (Appellant's brief at 20.)

{¶ 25} Our review of the motion for permanent custody confirms that FCCS did not invoke or base its case on the 12-out-of-22 provision in R.C. 2151.414, the statute that governs the determination of an agency's motion for permanent custody of a child. "Before granting permanent custody [under R.C. 2151.414], a trial court must make two determinations by clear and convincing evidence." *In re C.W.*, 2020-Ohio-1248, at ¶ 54. First, the trial court must determine whether one of the five factors under R.C. 2151.414(B)(1) applies. Second, the trial court must determine "by clear and convincing

evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." *Id.* With regard to the first determination, FCCS specifically filed the motion under the first two of the five factors under R.C. 2151.414(B)(1). (Aug. 22, 2019 Mot. for Permanent Custody at 2.) Thus, FCCS intended to prove either that (1) "[t]he child is not abandoned or orphaned, *has not been* in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents" under R.C. 2151.414(B)(1)(a), or (2) "[t]he child is abandoned" under R.C. 2151.414(B)(1)(b). (Emphasis added.) FCCS did not invoke R.C. 2151.414(B)(1)(d), under which it would have had to prove that "[t]he child ha[d] been in the temporary custody of one or more public children services agencies* * * for twelve or more months of a consecutive twenty-two-month period." Thus, even if H.B. had properly objected to the magistrate's finding and not waived his challenge to it, the finding had no effect on the case FCCS had to prove.

{¶ 26} H.B. also argues that neither the magistrate's decision nor the trial court's judgment entry considered the "best interest" factors under R.C. 2151.414(D), the second determination required by R.C. 2151.414(B)(1). H.B. did not raise this specific objection to the magistrate's decision, as required by Juv.R. 40(D)(3)(b)(iv). Thus, the issue is waived with regard to that filing. Moreover, "unless a party requests findings of fact and conclusions of law, a trial court need not set forth specific factual findings regarding each R.C. 2151.414(D) best interest factor." *In re C.B.C.*, 4th Dist. No. 15CA18, 2016-Ohio-916, ¶ 41. *See also In re Day*, 10th Dist. No. 00AP-1191 (Feb. 15, 2001) ("R.C. 2151.414(D) does not require that the trial court set forth the specific factual findings that correlate to the factors set forth in the statute unless a party requests findings of fact and conclusions of law."). H.B. did not request findings of fact or conclusions of law after entry of the magistrate's decision, so he cannot fault the trial court for not providing a detailed analysis of the best interest factors in its final judgment.

{¶ 27} Furthermore, our review of the trial court's judgment shows that, although it did not specifically cite to the applicable statutory factors, its analysis applied them when conducting its de novo review before adopting the magistrate's decision. Based on its

"review of the record," the trial court found that Baby Boy N. "has no bond with any biological family members, but only knows the foster family," which had provided "a very loving home" for him. (Sept. 3, 2020 Decision & Jgmt. Entry at 6.) This observation was consonant with the first "best interest factor" under R.C. 2151.414(D)(1)(a), which is "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child."

{¶ 28} The second best interest factor is "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). The trial court noted "[t]he GAL has consistently recommended that this Court grant PCC." (Sept. 3, 2020 Decision & Jgmt. Entry at 6.) " 'The juvenile court properly considers the GAL's recommendation on the permanent-custody motion as part of the R.C. 2151.414(D)(1)(b) analysis where the children are too young to express their wishes.' " *In re D.N.*, 10th Dist. No. 19AP-755, 2020-Ohio-5092, ¶ 22, quoting *In re B/K Children*, 1st Dist. No. C-190681, 2020-Ohio-1095, ¶ 45. Due to Baby Boy N.'s tender age, reliance on the guardian ad litem's recommendation was entirely appropriate.

{¶ 29} The trial court's analysis also touched on "the custodial history of the child" under R.C. 2151.414(D)(1)(c). It noted that "the minor child was removed from his Mother's custody after he tested positive for illegal substances after birth and his mother refused to take him" and that currently he "is placed in a very loving home with foster parents who are able to adopt him." (Sept. 3, 2020 Decision & Jgmt. Entry at 6.) This custodial history supported the trial court's decision to adopt the magistrate's conclusion that granting permanent custody was in Baby Boy N.'s best interest. *See In re T.P.*, 8th Dist. No. 102705, 2015-Ohio-3679, ¶ 41 (R.C. 2151.414(D)(1)(c) factor applies where "[t]he child has been in the agency's custody since he was a few days old and was never returned to the custody of mother during the entire pendency of the case.").

{¶ 30} Other observations addressed "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). Noting that both "parents failed to remedy the problems leading to removal," their absence at "the final PCC trial,"

and the impossibility of placing Baby Boy N. with H.B. "because of his lengthy incarceration," the trial court concluded that he could not "be placed with either parent within a reasonable time and should not be placed with either parent." (Sept. 3, 2020 Decision & Jgmt. Entry at 6.) Clear and convincing evidence supported the magistrate's conclusion that it was "in the best interest of Baby Boy N." to grant the motion for permanent custody, and the trial court did not err by adopting this conclusion.

{¶ 31} H.B.'s final argument in support of the first assignment of error is that "the trial court's finding that [FCCS] made reasonable efforts to assist H.B. in his effort to establish paternity [was] against the manifest weight of the evidence." (Appellant's Brief at 22.) He criticizes the caseworker's attempts to advise him on how to establish paternity and faults her for "not explicitly advis[ing]" him that he could go to CSEA without C.N. to open a case or take a DNA test. (Appellant's Brief at 24.) He asserts that because he "was thwarted in his compliance with FCCS's instructions to establish paternity and FCCS did not make reasonable efforts to assist him," the agency failed in its burden to prove that it made reasonable efforts at family reunification under R.C. 2151.419. *Id.* at 26.

{¶ 32} Under R.C. 2151.419, "the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts." The Supreme Court of Ohio has held that "except for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43.

{¶ 33} In this case, every iteration of the case plan documented the need to establish paternity and FCCS's ongoing efforts to engage with H.B. to achieve this goal. In addition, immediately after granting temporary custody to FCCS, the magistrate specifically ordered C.N. and H.B "to cooperate with [CSEA] in establishing paternity" of Baby Boy N. (Oct. 15, 2018 Mag.'s Order.) Ms. Zych testified at the hearing she spoke with H.B. on four different occasions about establishing paternity, her supervisor spoke with him, and each time he

was given the necessary information.  Clear and convincing evidence supported the trial court's conclusion that FCCS made repeated attempts to assist H.B. in order to comply with the case plan objective, the magistrate's order, and its responsibility under R.C. 2151.419 to make "reasonable efforts" at reunification.  H.B. was not "thwarted" from establishing paternity, as he protests.  Rather, the agency was thwarted by H.B.'s inaction. The first assignment of error is overruled.

{¶ 34}  H.B.'s second assignment of error asserts the trial court abused its discretion when it denied his attorney's request to call his mother as a witness.  He argues that his attorney had not actually rested his case before making the request and that she "could have provided sworn testimony about her relationship with Mother and H.B.; problems establishing paternity; reasons for delaying her home study; and her interactions with the caseworker and GAL."  (Appellant's Brief at 29.)

{¶ 35}  The record is unclear as to whether H.B.'s attorney had formally rested before his mother's outburst.  After the magistrate asked if he had any witnesses, H.B.'s attorney replied: "Your Honor, I have no -- I don't think I have any witnesses, but I would note Your Honor, that I believe that [H.B.'s mother] is seeking to gain the Court's attention."  (Tr. at 61.)  The trial court read this exchange to mean H.B.'s "counsel had already rested his case when he tried to call an additional witness * * * to the stand."  (Sept. 3, 2020 Decision & Jgmt. Entry at 5.)  Whatever the status of his case, it is apparent H.B.'s attorney had no preexisting intention of calling H.B.'s mother as a witness before she stood up and began speaking out in court.

{¶ 36}  At any rate, under Juv.R. 40(C)(2), "magistrates are authorized, subject to the terms of the relevant reference, to regulate all proceedings as if by the court and to do everything necessary for the efficient performance of those responsibilities, including * * * [p]utting witnesses under oath and examining them."  A trial court's decision overruling an objection to a magistrate's decision to not allow a witness is reviewed for an abuse of discretion.  *Perez v. Perez (In re Perez)*, 10th Dist. No. 04AP-126, 2004-Ohio-5068, ¶ 20.

{¶ 37}  The hypothetical subject matter of his mother's testimony that H.B. describes was, at best, of marginal relevance to the issue before the magistrate.  Testimony concerning her relationships with C.N., who abandoned the child, and H.B., who never established paternity, were irrelevant to the best interest factors under R.C. 2151.414(D)(1).  Those

factors all concern the *child*, such as "[t]he interaction and interrelationship of the *child* and the child's parents," the "wishes of the *child*," "the custodial history of the *child*," and "the *child's* need for a legally secure placement." (Emphasis added.) R.C. 2151.414(D)(1).

{¶ 38} Similarly, H.B.'s mother's reasons for delaying a home study or her interactions with the caseworker and GAL might have been relevant to the determination of a motion for custody, but she did not seek custody during the months between the October 15, 2018 grant of temporary custody to FCCS and the dispositional order of temporary court custody to the agency on January 11, 2019. *See* R.C. 2151.353(A)(3) ("if a child is adjudicated an abused, neglected, or dependent child, the court may * * * award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child"); *see also In re J.P.*, 10th Dist. No. 15AP-193, 2015-Ohio-4687, ¶ 3 (grandmother moved for legal custody four months after dependency complaint filed).

{¶ 39} Finally, we believe the magistrate heard adequate testimony from Ms. Zych and the guardian ad litem concerning H.B.'s "problems establishing paternity." (Appellant's Brief at 29.) We are not convinced his mother's testimony would have been based on personal knowledge, given the relevant interactions were between H.B. and FCCS representatives. We find no error in the trial court's decision to overrule the objection to the magistrate's ruling excluding H.B.'s mother as a witness. The second assignment of error is overruled.

{¶ 40} In the third assignment of error, H.B. argues his "trial counsel was ineffective for failing to object to insufficiencies in the trial court's judgment awarding permanent custody to FCCS." (Appellant's Brief at 31.)

{¶ 41} Under R.C. 2151.352, a parent "is entitled to representation by legal counsel at all stages of the proceeding" terminating their parental rights. In addition to the statutory right, the right to counsel "also arises from the guarantees of due process and equal protection contained within the constitutions of Ohio and the United States." *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 24, citing *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6 (1980), paragraph two of the syllabus ("In actions instituted by the state to force the permanent, involuntary termination of parental rights, the United States and Ohio Constitutions' guarantees of due process and equal protection of the law require

that indigent parents be provided with counsel."). "Parents who are parties in proceedings involving the termination of parental rights are entitled to the effective assistance of counsel." *In re C.P.*, 10th Dist. No. 08AP-1128, 2009-Ohio-2760, ¶ 56, citing *In re Brooks*, at ¶ 24.

{¶ 42} "The test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody." *In re Brooks* at ¶ 24, citing *In re McLemore*, 10th Dist. No. 00AP-974 (Mar. 20, 2001). There are "two components" to the test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), that a party claiming ineffective assistance of counsel must prove. Under the first component, the party "must show that counsel's performance was deficient," by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The second component requires a showing of prejudice. *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair" proceeding with a reliable result. *Id.* However, a court is not required "to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.

{¶ 43} H.B. claims that his counsel was deficient for failing to argue that FCCS did not prove the "twelve of twenty-two months" factor under R.C. 2151.414(B)(1)(d) or to challenge the trial court for failing to consider the best interest factors under R.C. 2151.414(D)(1). (Appellant's Brief at 32-33.) As previously discussed, FCCS did not move for permanent custody based on R.C. 2151.414(B)(1)(d), so his counsel was not deficient for failing to raise this argument. As we also discussed, the trial court was not required to track the statute precisely in its analysis.

{¶ 44} H.B. also asserts his "trial counsel was ineffective for failing to challenge the court's failure to find termination of parental rights was in the best interest of the child." (Appellant's Brief at 32.) But he states no grounds on which his counsel could have challenged the trial court's finding. Prejudice under *Strickland* is defined as "a reasonable probability that, but for counsel's alleged errors, the outcome of the proceeding would have

been different." *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 142.  The record in this case is devoid of any evidence that could have even minimally countered what FCCS presented to prove that granting the agency permanent custody was in Baby Boy N.'s best interests.  H.B. was not prejudiced by his counsel's failure to present a futile argument.  The third assignment of error is overruled.

{¶ 45}  Having overruled the three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BROWN and BEATTY BLUNT, JJ., concur.

_____