[Cite as *In re B/K Children*, 2020-Ohio-1095.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: B/K CHILDREN. | : | APPEAL NO. C-190681<br>TRIAL NO. F16-1937X |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 25, 2020

*Christopher P. Kapsal*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jonathan Halvonik*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*ProKids, Inc.*, and *Paul Hunt*, Attorney for Guardian ad Litem Morgan Zak.

**WINKLER, Judge.**

{¶1}     Mother appeals the juvenile court's judgment granting the Hamilton County Department of Job and Family Services's ("HCJFS") motion for permanent custody of her two young children, P.B. and L.K.  This case is on appeal for the second time.  We previously reversed the juvenile court's April 2019 judgment adopting the magistrate's decision granting the motion for permanent custody.  *In re: B/K Children*, 1st Dist. Hamilton No. C-190269, 2019-Ohio-5503.  We set it aside because the record did not reflect that the juvenile court had considered all the statutory best-interest factors when resolving HCJFS's motion.  On remand, the juvenile court issued a new decision, journalized on November 15, 2019, also adopting the magistrate's decision granting permanent custody to HCJFS, but reflecting that the court had considered all the statutory best-interest factors in arriving at that determination.

{¶2}     Mother now appeals from the November 2019 judgment, raising two assignments of error.  First, she argues the juvenile court failed to specifically overrule her objections to the magistrate's decision, as required by Juv.R. 40.  Second, she contends the decision to grant permanent custody to the agency and terminate her parental rights was not supported by clear and convincing evidence and was against the weight of the evidence.

{¶3}     We conclude that the juvenile court's judgment complies with the requirements of Juv.R. 40.  Further, we conclude that the evidence supports the juvenile court's decision to grant the agency's motion for permanent custody.  Notwithstanding progress made by mother in remedying some of the conditions that led to the children's removal, the evidence shows she repeatedly failed to remedy the safety risk posed by domestic violence and will not be able to protect the children within a reasonable time or

ever. The evidence also shows that a grant of permanent custody best serves the needs of the children. Because the errors assigned are not demonstrated in the record, we affirm.

Background Facts and Procedure

{¶4} This case began in August 2016, when four-month-old P.B. lived with mother, then 16 years old, in the home of maternal grandmother. Mother and maternal grandmother engaged in an altercation to which the police responded. Maternal grandmother refused to allow mother back in the home due to her "out of control behaviors," leaving mother and P.B. homeless. P.B.'s father, P.E., had previously abandoned him. The agency was granted emergency and interim custody and then temporary custody after P.B. was adjudicated dependent.

{¶5} Mother, who was subsequently diagnosed with depressive bipolar disorder, made progress with her case-plan goals, which included learning to control her anger and receiving mental-health treatment. The agency remained concerned about mother's ability to protect P.B., because she had been in a mutually violent, romantic relationship with a man named D.K. In the spring of 2017, the agency supported remanding custody of P.B. to mother with orders of protective supervision. The agency was supportive of reunification in part because maternal grandmother had allowed mother back into her home and D.K. was incarcerated. Further, both mother and maternal grandmother agreed to a safety plan to protect the child from domestic violence once D.K. was released from prison. Mother regained custody of P.B. in April 2017 with the requested orders of protective supervision.

{¶6} Despite mother's contrary representations to the agency, she did not end her romantic relationship with D.K., who was released from incarceration before mother gave to birth to D.K.'s child L.K. in August 2017. Mother and D.K. argued in the hospital

room shortly after L.K.'s birth and mother called 911. Mother did not report the incident to the agency's ongoing caseworker, but hospital staff did. When the caseworker questioned mother about the incident, mother initially denied that it had occurred. Mother did eventually accurately report the incident to her caseworker, and also told the caseworker about a subsequent incident when D.K. had kicked his way into her home and broke items.

{¶7} In late September 2017, while the caseworker and the children's Court Appointed Special Advocate ("CASA") were at mother's home for a visit, D.K. appeared at the front door, upset at mother because he could not locate his car. Mother acted surprised to see him and told her caseworker and the CASA that she had had no contact with D.K. for weeks. Mother later admitted to her caseworker that D.K. had spent the previous night in the home. The caseworker told mother not to have contact with D.K., and mother agreed. The caseworker also warned D.K. that the children would be removed if he had violent contact with mother.

{¶8} On October 1, 2017, D.K. broke into the home of mother and the maternal grandmother and assaulted mother. The children were removed from the home and adjudicated dependent and abused. The adjudication was due in part to stipulations from mother that D.K. had punched her several times in the presence of the children, she and D.K. had a history of domestic violence, and she maintained a relationship with D.K. despite his past threats to harm her.

{¶9} In November 2017, per agreement of mother, the court placed the children in the temporary custody of the agency with a goal of reunification with mother. Mother completed an updated diagnostic assessment in January 2018. Her case plan involved individual therapy, case-management services, medication, and regular visitation, including attending the medical appointments for the children, and following

through on the safety plan to protect the children from domestic violence. D.K.'s case-plan goals were to complete a diagnostic assessment and follow recommendations, complete parenting education, and complete a domestic-violence assessment, none of which he participated in.

{¶10} In April 2018, D.K. once again attacked mother in her home. Mother called the police but gave a false identity and never contacted HCJFS. The agency caseworker noticed a police report involving mother's address and asked mother about the incident. Mother initially denied knowing anything about the assault and claimed the police had written down the wrong address. Mother later revealed to the caseworker that D.K. had assaulted her at her home, but claimed she did not know how he had learned her address. Mother assisted with his prosecution, which led to his incarceration, but only after HCJFS's involvement.

{¶11} Although mother eventually assisted with D.K.'s prosecution, the caseworker's investigation led her to believe that mother was continuing to mislead the agency about her relationship with D.K. Further, the agency concluded that mother's continued dishonesty, immaturity, and lack of insight into how domestic violence affected the children, despite the provision of services to remedy the condition that she protect the children from exposure to domestic violence, required termination of her parental rights.

{¶12} HCJFS moved for permanent custody of the children in July 2018. At the time, 26-month-old P.B. had been in the agency's custody for over 13 months of a continuous 22-month period. Eleven-month-old L.K. had been in agency custody for all but two months of her life, residing together with P.B. in foster homes. The children's guardian ad litem ("GAL") supported the agency's motion for permanent custody.

{¶13}   In January 2019, a magistrate proceeded on the permanent-custody motion.   She heard testimony from employees of HCJFS, including the ongoing caseworker from September 2016 to December 2018, the CASA for the children who had continuously served since her appointment in September 2016, mother, maternal grandmother, and D.K.  D.K. was incarcerated and his testimony was presented by video streaming.

{¶14}   The caseworker testified to the history of the case, including mother's struggle to end her violent relationship with D.K. and her deceptive representations and acts that protected him and not the children.  She found mother's plan to protect the children from domestic violence incredible because mother had repeatedly lied in the past and unequivocally wanted D.K. involved in L.K.'s life upon his release from prison.

{¶15}   The caseworker further testified that mother had a "hot and cold" and sometimes violent relationship with maternal grandmother, but that relationship had improved when mother moved out of maternal grandmother's home and into her own apartment.   According to the caseworker, mother's progress also included obtaining stable employment, which had appeared to end mother's involvement in shoplifting. Further, the caseworker reported that mother was mostly compliant with her mental-health and case-management services, but that she still lacked insight into how the violence between her and maternal grandmother and D.K. had affected the children's development and growth.

{¶16}   Finally, the caseworker informed the court that mother's visitation was consistent, but had occurred at the supervised level, and that, based on her interactions with the family, mother did not have a reliable support network.  The caseworker concluded that mother's positive progress in some areas did not offset the domestic-violence issues that were preventing the return of the children to mother's care.

{¶17}  The CASA appointed to protect the children provided the court with insight into the needs of the children. This included P.B.'s extensive medical issues that required multiple surgeries to remove hemangioma and insert ear tubes, and ongoing therapy for his speech and developmental delays.  The CASA testified that mother did not take P.B. to many of his medical appointments at Children's Hospital after custody had been remanded to her in April 2017 and was inconsistent in attending his more recent appointments. Further, she reported that when mother did attend P.B's medical appointments along with the foster parent, she never observed mother implement the recommended protocol to help P.B. with his significant speech delay.

{¶18}  Notwithstanding P.B.'s issues and the turmoil caused when P.B. was remanded back to mother in 2017, the CASA said P.B. was progressing while in foster care.  Ultimately, based on her personal involvement with the children and mother during the course of two and one half years, she did not believe mother would follow through with the consistent therapy, care, and protection that the children were receiving and needed.

{¶19}  Mother was 19 years old at the time she presented her own testimony opposing the motion for permanent custody.  She acknowledged that she and D.K. had been mutually violent, and stated that she was deceptive with the agency because she believed if she did not lie she would lose her kids.  Mother asserted that she had matured and no longer wanted to be in a relationship with D.K., imprisoned since April 2018 and set to be released in April 2019.  Mother indicated, however, without qualification, that she wanted D.K. to have a relationship with L.K. and would facilitate that relationship when he was released from prison, notwithstanding his history of domestic violence.

{¶20}  The plan mother announced to allow her to support the children also connected her to D.K., as she intended to ask D.K.'s mother to care for the children while

she worked her third-shift job. She recognized that maternal grandmother's significant employment responsibilities prevented her from even providing transportation assistance. Nonetheless, she indicated these grandmothers would be her support network when the children were remanded to her.

{¶21} Mother testified that she had anger-control and depression issues and had taken the medication prescribed for her mental-health diagnosis, except when pregnant with L.K. While she indicated that she had been mostly compliant with the requirement that she attend individual therapy, she rejected the idea that she needed ongoing support to avoid domestic violence in the future.

{¶22} Mother's claim that she had finally ended her romantic relationship with D.K. was corroborated by both maternal grandmother's and D.K.'s testimony. Maternal grandmother supported reunification with mother and indicated that mother had made positive changes since 2016, resulting in a "slightly better" "attitude" and an improvement in their relationship. D.K. supported reunification with mother, too. He testified that he does not intend to continue a relationship with mother, but does intend to have a relationship with L.K. upon his release from prison. Further, he expressed his opinion that domestic violence had not been an issue between him and mother, explaining that

> [W]e fought a few a couple of times, but I don't feel like I have an issue as
>
> to beating on [mother], no. I don't have the issue to where I can just
>
> come in the house and just beat on [mother] for no reason. So, I don't
>
> feel like I have an issue. * * * But I have done it before, though.

{¶23} Although mother requested an extension of temporary custody, to allow more time to prove that she was no longer in a relationship with D.K. and that she would carry out the safety plan to protect the children, the magistrate issued a decision

granting the agency's motion for permanent custody of the children. The magistrate's disposition was guided in part by her finding that "[mother's] assertion that she has a plan to keep the children and herself safe is not credible. She had the same plan before and did not follow through."

{¶24} Mother objected to the magistrate's decision. In April 2019, the trial court overruled mother's objections, adopted the magistrate's decision, and entered a judgment granting permanent custody to HCJFS. The juvenile court entered a second judgment granting permanent custody to HCJFS in November 2019, after this court's reversal of the April 2019 judgment and remand of the case with instructions.

## The Appeal

{¶25} Juv.R. 40(D)(4)(d) requires the trial court when acting on a magistrate's decision to rule on the objections before entering a final judgment. In her first assignment of error, mother contends the juvenile court failed to comply with this rule when it issued the November 2019 entry. This court does not agree.

{¶26} Mother objected to the magistrate's decision on grounds that the grant of permanent custody to HCJFS was not in "the children's best interest and [was] against the weight of the evidence." In its November 2019 decision, the juvenile court initially recounted how, in its prior judgment, it had "den[ied] Mother's objections" to the magistrate's decision and adopted the magistrate's findings of fact and conclusions of law "after conducting an independent review following the filing of objections." The court then stated that

> in conducting an independent review of the record [on remand], this
> Court has reviewed and considered all transcripts, filings, exhibits, and
> arguments submitted to the Court. Based on an independent review of
> the record, the Court finds that the findings of fact and conclusions of law

9

contained in the Magistrate's Decision dated January 15, 2019, are supported by clear and convincing evidence, and are incorporated by reference herein as fully set forth herein. The Court further supplements the Magistrate's Decision with the findings and conclusions discussed below.

{¶27} Although it is preferable that the court use words such as "sustained," "denied," "overruled," or the like, when disposing of objections, the language used by the court in its November 2019 decision leaves no question that it properly considered mother's objections, found them meritless, and overruled them. Because the juvenile court did rule on her objections as required by Juv.R. 40(D)(4)(d), we overrule the first assignment of error.[1]

{¶28} In her second assignment of error, mother challenges the sufficiency and weight of the evidence supporting the juvenile court's judgment.

{¶29} R.C. 2151.414 governs the findings the juvenile court had to make before granting permanent custody of these children to HCJFS. Under R.C. 2151.414(B), the juvenile court may grant a motion for permanent custody if the court determines, by clear and convincing evidence, that permanent custody is in the best interest of the child and that one of the five conditions set forth in R.C. 2151.414(B)(1) applies. Clear and convincing evidence "is evidence sufficient to 'produce in the mind of the trier of fact[ ] a firm belief or conviction as to the facts sought to be established.' " *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46, quoting *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42.

---

[1] Mother also alleges as error the trial court's failure to "specifically adopt, modify or reject the magistrate's decision." We consider this claim as abandoned because mother presents no argument in support of this claim, which is refuted by her own recitation of the facts.

**{¶30}** Here, the juvenile court found that the grant of permanent custody was in the best interest of the children. Additionally, with respect to P.B., it found applicable the "cannot or should not" condition of R.C. 2151.414(B)(1)(a) and the "12 of 22" condition of R.C. 2151.414(B)(1)(d). With respect to L.K., it found only the "cannot or should not" condition applied. Mother challenges only the "cannot or should not" and best-interest determinations.

### Cannot or Should Not Be Place with Mother

**{¶31}** The juvenile court's finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent requires clear and convincing evidence that at least one of the conditions listed under R.C. 2151.414(E) was present as to each parent.[2] Of relevance, the juvenile court found the evidence supported a finding under R.C. 2151.414(E)(1) that mother had failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home, notwithstanding reasonable case planning and diligent efforts by the agency to assist mother.

**{¶32}** Here, the foremost obstacle for the reunification of the children with mother was her failure to address the domestic-violence scenario. Mother contends that notwithstanding her history of failing to protect the children, the evidence showed it was more likely that she would protect the children in the future. She relies on the undisputed testimony showing her completion of several of her case-plan goals, such as obtaining stable housing, and her ultimate cooperation in the criminal prosecution of D.K. for domestic violence. Additionally, she directs us to the testimony she presented

---

[2] The juvenile court's "cannot or should not" finding was superfluous with respect to P.B. for purposes of satisfying one of the conditions of R.C. 2151.414(B)(1)(a)-(e), because P.B.'s custodial history satisfied the "12 of 22" condition of R.C. 2151.414(B)(1)(d). But the juvenile court properly used its "cannot or should not" finding when evaluating P.B.'s best interest.

showing that she had matured and had finally ended her romantic relationship with D.K. Thus, she claims the court lacked clear and convincing evidence to support a determination that she had failed to remedy the conditions that led to removal. We disagree.

{¶33} As the juvenile court pointed out in its decision, the evidence showed that mother's repeated dishonesty aggravated her repeated failure to protect the children. This repeated dishonesty protected D.K. and put her children at risk of physical and emotional harm and losing mother's care. Notably, mother did not fully cooperate in D.K.'s 2018 prosecution until the agency persistently pursued the issue. Further, mother unequivocally acknowledged that she would allow D.K. to be a part of L.K.'s life upon his release from prison. Yet D.K. had not taken part in case-plan services and testified he did not believe that he and mother had a violent relationship because he did not "beat on [mother] for no reason." Relatedly, mother acknowledged the pervasive domestic violence in her life, but failed to appreciate her need for ongoing support directed to this issue.

{¶34} Ultimately, the threat of harm to the children is not speculative but is grounded in the facts and leaves these children unprotected in the future. *See In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, at ¶ 103. The juvenile court was able to observe the witnesses, and we have no reason to reject the presumption that the court's finding with respect to mother's credibility was correct in light of the evidence, including unequivocal evidence of mother's pervasive dishonesty and her lack of insight into domestic violence. *See In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16.

{¶35} Based on these facts, which demonstrate mother's failure to remedy the unsafe conditions that led to the children's removal, we conclude that the juvenile

court's "cannot not or should not" determination is supported by clear and convincing evidence and is not against the weight of the evidence.

## Best Interest

{¶36} The safety risk to the children is the primary reason, but not the only reason, that their best interest would not be served by returning them to mother. In assessing the best interest of a child for purpose of a permanent-custody determination, a juvenile court must consider all relevant factors, including (a) the child's interaction with parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (b) the child's wishes, as expressed directly by the child or through the child's GAL; (c) the child's custodial history, including whether the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in divisions (E)(7) to (11) of [R.C. 2151.414] apply in relation to the parents and child. R.C. 2151.414(D)(1)(a)-(e).

{¶37} The juvenile court discussed each of the best-interest factors with respect to each child in its November 2019 decision. With respect to the children's interaction with significant others and the resulting bonding, the court found no bonding between the children and their fathers, who had not been a part of their lives. The court found that the children had bonded with the foster family they had been placed with until December 2018, when the children were placed with a new family, but discounted the significance of that bond. The court was unsure whether the children had a bond with mother, from whom they had lived apart for most of their short lives. Finally, the court noted that mother appeared bonded to the children. The court, however, had concerns

13

that mother did not appreciate or understand the high level of care necessary to manage P.B.'s medical conditions because she had been inconsistent at times with attending his medical appointments.

{¶38} In considering the wishes of the children, the court noted that the GAL for the very young children had submitted a report recommending an award of permanent custody to HCJFS. The court also summarized the custodial history of each child, reiterating that at the time the agency had filed for permanent custody in July 2018, P.B. was 22 months old and had been in agency custody for 13 months of the preceding consecutive 20 months, having lived the majority of his life in agency custody. L.K. had lived all but the first two months of her life in agency care.

{¶39} Finally, the court found that the children needed a legally secure placement and that that type of placement could not be achieved without a grant of permanent custody to the agency. The court reiterated that the "very young children" "who have spent the majority of their lives in custody of HCJFS" cannot and should not be placed with any of the parents, including mother, who had repeatedly failed to demonstrate her ability to address the domestic-violence scenario. The court then explained:

> This is not a case where it is simply the existence of [D.K.] that is preventing the children from returning to [m]other's care. Rather, [D.K.'s] violent behavior is compounded by the safety risk posed to the children by [m]other's own violent behavior, dishonesty, and continued unwillingness to protect the children from [D.K.].

{¶40} The court further expounded on the significant medical needs of each child and the mother's lack of a suitable network to help her manage the children's

conditions. After weighing all the best-interest factors, the court determined that an award of permanent custody best served the children's needs.

{¶41} Mother argues the juvenile court's findings under several of the statutory best-interest factors are not supported by sufficient evidence. For instance, she suggests there is no evidence to support the court's concern that she may not understand or appreciate the level of care needed to manage the children's conditions. But the children's CASA testified to this concern, stating that mother failed to take P.B. to his appointments when she had custody of him and was inconsistent in attending his more recent appointments, a fact mother confirmed. Further, mother testified that she was not aware of some of L.K.'s medical issues such as posttraumatic stress disorder.

{¶42} Mother additionally argues that the court erred by considering the bond between the children and their foster family because the children had been placed with a new foster family just prior to the trial. Mother, however, misinterprets the court's discussion of this issue. The court explained that it considered the bond between the children and their former foster family only to the extent that it shows the children's "ability to bond to substitute caregivers."

{¶43} Next, mother argues the juvenile court should not have considered the GAL's recommendation of permanent custody as part of the R.C. 2151.414(D)(1)(b) analysis, even though the children were too young to express their wishes. We disagree.

{¶44} A GAL is appointed to "to assist a court in its determination of a child's best interest," Sup.R. 48(B)(1), and is required "to protect the interest of the child," R.C. 2151.281(B). To carry out her duties, the GAL in this case was required to ascertain the children's wishes, *see* Sup.R. 48(D)(13)(c), and to promptly notify the court if those wishes conflicted with the GAL's conclusion as to the best interest of the children. *See* Sup.R. 48(D)(8).

15

{¶45} The juvenile court properly considers the GAL's recommendation on the permanent-custody motion as part of the R.C. 2151.414(D)(1)(b) analysis where the children are too young to express their wishes. *See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 60, applying the identically worded former R.C. 2151.414(D)(2); *In re X.M.W.*, 1st Dist. Hamilton Nos. C-190568 and C-190595, 2020-Ohio-449, ¶ 16; *In re J.R.*, 1st Dist. Hamilton No. C-190342, 2019-Ohio-3500, ¶ 32. Accordingly, we reject mother's argument that the juvenile court improperly considered the GAL's position when fulfilling its statutory duty to consider the children's wishes under R.C. 2151.414(D)(1)(b).

{¶46} Next mother contends the juvenile court failed to give adequate weight to her demonstrated bond with the children and the progress she made when the children were out of her care. She cites this evidence as strong proof that she will protect the children in the future and that an award of permanent custody to the agency is not in their best interest.

{¶47} We commend mother for her love and efforts. But we are not persuaded that the juvenile court erred when finding that the children's best interest was served by a termination of her parental rights. As we have previously stated, the threat of harm to the children is grounded in the facts and is not speculative. Moreover, a parent's fundamental interest in raising a child "is not absolute." *In re D.A.,* 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. Once a custody case reaches the dispositional stage, "the best interest of the child controls," not the parent's interest. *Id.* Here, both children have lived the majority of their lives in HCJFS custody because mother failed to timely remedy the conditions that led to their removal. Further, mother's lack of insight into the issue of domestic violence in her life is alarming and her own violent tendencies

cannot be overlooked. These very young children need a stable and secure placement now. Mother cannot provide this (nor can either father), but adoption can.

**{¶48}** The trial court's best-interest determination is supported by clear and convincing evidence and is not against the manifest weight of the evidence.

**{¶49}** Consequently, we overrule the second assignment of error because the juvenile court's "cannot or should not" and best-interest determinations are supported by sufficient evidence and are not against the weight of the evidence.

### Conclusion

**{¶50}** For the foregoing reasons, we affirm the juvenile court's judgment granting HCJFS's motion for permanent custody of P.B. and L.K. and terminating the parental rights.

Judgment affirmed.

**MOCK, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry this date.