[Cite as *In re T.J.*, 2022-Ohio-1946.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE T.J., ET AL.

Minor Children

[Appeal by J.W., Mother]

:
:
:
:
:
:

No. 111154

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 9, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD17915685, AD17915686, AD17915688, and AD17915689

---

*Appearances:*

Valore & Gordillo LLP and Matthew O. Williams, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

FRANK DANIEL CELEBREZZE, III, P.J.:

{¶ 1} Appellant J.W. ("Mother") appeals the decision of the Cuyahoga County Juvenile Court terminating her parental rights and awarding custody of her minor children to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "agency"). After a thorough review of the law and applicable facts, we affirm the judgment of the juvenile court.

## I. Factual and Procedural History

{¶ 2} The four children involved in this matter, T.W., I.W., Mac.J., and T.J.,[1] had been removed from their home and placed in predispositional temporary custody in October 2017.  CCDCFS first became involved in this matter due to issues with Mother's failure to provide appropriate supervision and recurring issues with leaving the children with appropriate caregivers, which led to T.W.'s repeated rape by appellee M.J., who is the father of Mac.J. and T.J.  M.J. is incarcerated for rape and gross sexual imposition of T.W. and is not due to be released until 2029.

{¶ 3} T.W.'s father is O.P., who has had little contact with the agency or T.W. and is not a party to this appeal.  The father of I.W. is A.B.  At the time of the hearing, A.B. was also incarcerated for sexual battery and abduction; he is due to be released in September 2022.  M.J. and A.B. participated in the proceedings below but are not parties to the instant appeal.

{¶ 4} The children were adjudicated abused and neglected and committed to temporary custody in February 2018, which was extended twice.  In January 2020, they were reunified with Mother with ordered protective supervision.  T.W. was again placed in interim agency custody in April 2020, and I.W., Mac.J., and T.J., were placed in interim custody in June 2020.  All four children were again committed to the temporary custody of CCDCFS in November 2020.

---

[1] There are seven children total in the home; however, the agency only sought permanent custody of four.  Legal custody was sought for the other three, which was handled in a separate matter and is not before us in this appeal.

**{¶ 5}** The most recent removal was the result of physical altercations between Mother and T.W., along with concerns about the appropriateness of the home, individuals coming in and out of the home, Mother's decision-making skills, and Mother's ability to meet the children's basic and safety needs.

**{¶ 6}** When the children had been reunified with Mother in January 2020, the court had ordered protective supervision by CCDCFS. The agency intended to continue to offer services and work with the family with the goal of reunification, but Mother failed to demonstrate benefit from those services and the children were again removed.

**{¶ 7}** The agency moved for temporary custody and later moved for permanent custody. The trial court held a hearing on the motion for permanent custody, wherein the state presented the testimony of Tonya Lily, who worked for Specialized Alternatives for Family and Youth ("SAFY"), which is a foster care agency.

**{¶ 8}** Ms. Lilly became involved with Mother and the four children at the time of the reunification in January 2020. She worked to help them adjust to being home with Mother and assisted Mother in getting appointments for the children's medical, psychological, and specialized services.

**{¶ 9}** In addition, Ms. Lilly assisted Mother in achieving structure in the home and teaching her communication, age-appropriate consequences for the children, and ensuring that the children's basic needs were met.

{¶ 10} Ms. Lilly testified that things went well with Mother and the children for the first couple of months and then began to deteriorate. The children were missing school, Mother was missing appointments, and men were coming in and out of the home. Mother also began not responding to Ms. Lilly's phone calls.

{¶ 11} Ms. Lilly stated that the services provided to Mother during this time were unsuccessful. Ms. Lilly was concerned about different men being in the home because T.W. had been sexually abused, and one of the other children was acting out sexually. Ms. Lilly learned that Mother was leaving the children with various men and had discussed with her certain sleeping arrangements that were necessary for the children's safety. Specifically, Mother was supposed to sleep downstairs to protect the children from sexually acting out on each other but had not been doing so.

{¶ 12} Ms. Lilly also testified that Mother had poor decision-making skills because the men she chose to associate with were abusive or sex offenders. She also allowed her sister in the house when she had previously told Ms. Lilly that she was not in contact with her sister because she was a drug user.

{¶ 13} Tiffany Mahoney, the case worker assigned to the matter, testified at the hearing, and stated that the case plan for Mother included services for domestic violence, parenting, mental health, and substance abuse. At the time of the hearing, Mother had completed a domestic violence program through Journey for Safety and Healing. She had been referred for domestic violence services due to two on-and-off relationships she was in prior to the children being removed for the second time

and during the time of removal. One of the men was also a registered sex offender. When Ms. Mahoney discussed the domestic violence concerns, Mother acknowledged them but stated that she was no longer in a relationship with either man; however, the agency had received information that they were still in Mother's life.

{¶ 14} Ms. Mahoney testified as to T.W.'s removal in April 2020. She testified that there had been physical altercations between T.W. and Mother, and there were concerns for the safety of the other children. Thereafter, there were concerns regarding Mother's decision making, her choice of individuals in the home, and her ability to continue to meet the basic and safety needs of the children.

{¶ 15} The agency's emergency custody of T.W. was based upon several physical altercations between Mother and T.W. Ms. Mahoney testified that Mother was feeling as though she could not maintain T.W. at that time. At the time of the hearing, T.W. had been placed in a female group home and was receiving individual and group counseling services. The counseling was recommended because of sexual abuse that T.W. had suffered at the hands of M.J. While in the group home, T.W. was having phone contact with Mother along with face-to-face visits.

{¶ 16} The agency had received information that one of the men Mother had a relationship with had assisted her in aiding T.W. to go AWOL from her placement. They also had received photos from the other man depicting himself, Mother, and T.W. in New York during the time T.W. was AWOL.

{¶ 17} T.W. had first gone AWOL in January 2021 and was gone until February 2021. She had been picked up by the Willoughby Police Department after Mother had been pulled over for a routine traffic stop. The police contacted the agency, and Ms. Mahoney picked T.W. up from the police department.

{¶ 18} Several weeks later, T.W. went AWOL again. The agency was able to monitor her social media and noted that several of the photographs appeared to be taken in Mother's home.

{¶ 19} In an effort to locate T.W., the agency made a missing person's report, contacted the National Center for Exploited and Missing Children, and made several unannounced visits to Mother's home. The agency inquired with Mother and attempted to reach T.W. through social media but was unsuccessful.

{¶ 20} In July 2021, Mother reported dropping T.W. off at a shopping center in the Akron-Canton area where T.W. had planned to meet her boyfriend. Mother did not bring T.W. to the agency because she did not believe that T.W. would have let her.

{¶ 21} Ms. Mahoney testified that the evening prior to the hearing, she had received a phone call from Mother that she had T.W. and brought her to the agency. T.W. was then placed in a foster home. Ms. Mahoney acknowledged that this instance reflected good judgment on Mother's part.

{¶ 22} Ms. Mahoney also testified as to Mother's case plan. Ms. Mahoney stated that while Mother had completed the domestic violence services, she did not

believe that Mother had demonstrated sufficient benefit from the courses because the men in question continued to be active in her life.

{¶ 23} Mother received mental health services through Frontline. Ms. Mahoney stated that Mother was mostly compliant with the Frontline services but that there were ongoing concerns with Mother's mental health, including her decision making and judgment regarding relationships and the children.

{¶ 24} Mother was also referred for an alcohol and drug assessment and outpatient services through Catholic Charities, which she successfully completed. Mother's last screen before the hearing was in July 2021 and was negative.

{¶ 25} Finally, Mother was referred to Supportive Services for a parenting coach and completed the Ohio Guidestone parenting program. Mother was asked to engage in Family Counseling Services with T.W., but could not because T.W. was AWOL.

{¶ 26} Mother had weekly two-hour supervised visits with the children that took place at Ohio Guidestone with the parenting coach or in the community. Ms. Mahoney testified that Mother had missed a number of visits and when she was attending visits, they were chaotic and overwhelming at times for Mother. During the visits, the children were happy and excited to see their mother.

{¶ 27} Ms. Mahoney testified that Mother had engaged with her up until July 2021 but then there was a slow decrease in her engagement. Mother had not attended a supervised visit with the children in the two months prior to the hearing,

although the agency had learned that Mother had attended one of the children's football games and saw two of the children at the location where they swim.

{¶ 28} Ms. Mahoney then discussed the placement of the children. T.J. and Mac.J. were in a foster home together. They had been in that placement since their initial removal. Ms. Mahoney testified that they are both doing well in the home, there were no concerns for their safety, and that their basic and special needs were being met. The children appeared happy and comfortable in the home.

{¶ 29} When asked about special needs of T.J. and Mac.J., Ms. Mahoney testified that T.J. and Mac.J. both have IEPs at school, through which they receive speech and physical therapy services. The girls also receive counseling and psychiatry services, and Mac.J. receives physiatry services.

{¶ 30} Ms. Mahoney testified that I.W. has been in a foster placement since June 2020 and is doing very well. She noted that there have been a couple of fights or incidents between him and another youth in the home, but that overall he seems comfortable in his placement. I.W. also receives counseling services as well as psychiatry services for his prescribed medication.

{¶ 31} Ms. Mahoney was asked about the agency's position with regard to custody. She stated that the agency has ongoing concerns relating to Mother's lack of appropriate judgment and decision making for her own well-being and that of the children. She acknowledged that Mother has engaged in and completed services, but stated that she has failed to truly benefit from the services and continues to act in the same pattern.

{¶ 32} Ms. Mahoney acknowledged that the children have a bond with their mother, but characterized it as a "parent-friend" bond rather than a "parent-child" bond. With regard to Mother's home, Ms. Mahoney testified that she had visited it and found it to be appropriate for the children.

{¶ 33} The GAL noted in his written report that Mother had missed many visits with the children during the prior three months and that she had been uncooperative with the agency and had major mental health issues. The GAL testified that he had met and spoke with each of the children. He was concerned by some of T.J.'s disclosures regarding sexualized behavior involving siblings and hearing Mother having loud sexual relations with her boyfriend.

{¶ 34} With regard to the children's wishes, the GAL stated that I.W. had expressed a desire to return to Mother and that T.W. had not really stated, but that the GAL had a sense that she also wanted to return to Mother. The GAL stated that T.J. and Mac.J. were too young to express their wishes.

{¶ 35} The GAL recommended permanent custody to the agency for each of the four children.

{¶ 36} Following the hearing, the court granted the motion for permanent custody to CCDCFS and terminated Mother's parental rights. The trial court made the following findings:

> (6) Given the aforementioned custodial history of the children, as of the filing date of March 10, 2021 for the Motion to Modify Temporary Custody to Permanent Custody, the children are considered to have been in the temporary custody of CCDCFS for at least twelve of the

previous twenty-two months in satisfaction of the condition listed at R.C. 2151.414(B)(1)(d).

(7) The evidence before the Court establishes by clear and convincing evidence that, notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the children to be placed outside the home, the parents have failed to continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the mother's home. Despite the completion of some case plan services, Mother has failed to demonstrate sufficient benefit from services to warrant consideration of reunifying the children with her at the time of trial.

(8) CCDCFS presented testimonial evidence to establish that despite mother's participation in case plan services over the years that she was involved with CCDCFS, mother has failed to demonstrate sufficient benefit from those services, some of which had been repeatedly referred. The children have previously been in custody of CCDCFS due to some similar issues as those which caused their removal from mother's home in the present matter. The children were previously in CCDCFS custody from October of 2017 through January of 2020, at which time they were reunified with Mother with Protective Supervision to CCDCFS. Just five months after reunification was ordered on January 6, 2020, the children were again removed from mother's care in April 2020 (T.W.) and June of 2020 (T.J., Mac.J., and I.W.).

(9) Mother has demonstrated continuing judgment issues which reflect poorly on her decision-making and parenting ability and which demonstrate her inability to provide appropriate care for the children. Testimony established that mother has continued to involve herself with individuals who pose a risk to the children. Notwithstanding her prior relationship with [M.J.] (who is in prison for the rape of child T.W.) and father [A.B.] (who is in prison for a sexual offense), each of whom is classified as a sexual offender. (See CCDCFS Trial Exhibits #1 and #3), mother has been involved with two additional abusive men who were in the home with her children during their brief reunification. One of these men [D.S.], who is also classified as a sex offender (see CCDCFS Trial Exhibit #10), has a significant criminal history including a sexual offense against a minor, as well as an offense of violence against this mother (who was identified in both the indictment and the resulting court entry as a "family or household member") for which he was convicted in September of 2020. See CCDCFS Trial Exhibits #5-10. When asked by her agency worker about her continued association

with such men, mother's response was "no comment." Additionally, the child T.W. went AWOL from the agency's custody in early 2021 and was returned to CCDCFS after she was found in a car with mother during a traffic stop. T.W. again went AWOL in February 2021 in February 2021 and remained AWOL until the evening before trial on October 26, 2021. During this extended AWOL period, T.W. frequented mother's home as evidenced by her social media posts in mother's home, traveled out-of-state with mother, and on one occasion was driven to Akron and dropped off in a parking lot so that T.W. could visit her boyfriend there. At no time during the extended AWOL period until the night before trial did mother ever take any steps to return T.W. to CCDCFS, who was the child's lawful legal custodian during this time.

(10) The fathers of the children have had little or no involvement with the children or with CCDCFS since the children's removal from the home.

* * *

(16) The evidence before the Court establishes by clear and convincing evidence that the children's mother and fathers have each demonstrated a lack of commitment toward the child[ren] by failing to regularly support, visit, or communicate with their children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children. Testimony at trial on October 26, 2021 established that mother last visited the children on August 24, 2021 and that despite having weekly visitation scheduled, mother has not appeared for a scheduled visit with her children for eight consecutive weeks (since August 24, 2021) which is a period of two full months. With regard to the children's fathers, fathers have had little or no contact with their children during the course of the proceedings since the children's initial removal. The children's mother has also demonstrated a lack of commitment to the children by her other actions showing an unwillingness to provide an adequate permanent home for the children, to wit: her continued involvement with unsafe sex offenders, who pose a risk to the children if reunification were to occur.

(17) Because of the parents' failure to remedy the conditions causing removal, lack of commitment, abandonment, and other relevant factors as noted above, the children cannot be placed with either parent within a reasonable time or should not be placed with either parent as contemplated by R.C. 2151.414(E).

(18) As of the time of trial, no relative or other interested person has filed, or has been identified in, a motion for legal custody of the children, nor has anyone appeared at trial to express an interest in serving as a legal custodian to any of these children.

(19) The child T.W. has been AWOL from her agency placement for much of the year prior to trial, returning to agency care just the evening prior to the day of trial; the child I.W. has had a difficult time adjusting to placement but has settled down and has become comfortable in his current placement; the children T.J. and Mac.J. are strongly bonded with their current placement caregiver family; Visits with mother were initially chaotic and overwhelming for mother but have become calmer once a parenting coach assisted mother in establishing a routine; the children have not had contact with their fathers for an extended period of time.

(20) The children's continued residence in or return to [t]he mother's home would be contrary to the children's best interest and welfare.

(21) CCDCFS has made reasonable efforts to prevent removal and/or to facilitate reunification of the children and to finalize the permanency plan for the children, including referral for services relating to substance abuse, domestic violence, anger management and parenting education, and mental health services.

{¶ 37} The court found that the allegations of the motion had been proven by clear and convincing evidence and that permanent custody was in the best interest of the children. The court further found:

Upon considering the interaction and interrelationship of the child[ren] with the child[ren]'s parents, siblings, relatives, and foster parents; the wishes of the child[ren]; the custodial history of the child[ren], including whether the child[ren] [have] been in temporary custody of a public children's services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period; the child[ren]'s need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and, the report of the Guardian ad Litem, the Court finds by clear and convincing evidence that a grant of permanent custody is in the best interests of the child[ren] and that child[ren]

cannot be placed with one of the child[ren]'s parents within a reasonable time or should not be placed with either parent.

\* \* \*

Following the placement of the child[ren] outside the child[ren]'s home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren]'s home.

The parent has demonstrated a lack of commitment toward the child[ren] by failing to regularly support, visit, or communicate with the child[ren] when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[ren].

{¶ 38} Mother then filed the instant appeal, raising one assignment of error for our review:

1. The trial court's award of permanent custody and termination of appellant's parental rights is against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 39} Mother argues that the trial court's decision to grant permanent custody of the children to the agency was against the manifest weight of the evidence and asserts that she had worked her case plan and was in position to care for her children.

{¶ 40} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S.

745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 41} Because termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14, it is "an alternative of last resort." *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

{¶ 42} A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence when the record contains competent, credible evidence by which it could have found that the essential statutory elements for an award of permanent custody have been established. *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919. Before a juvenile court can terminate parental rights and grant permanent custody of a child to CCDCFS, it must satisfy the two-prong test set forth in R.C. 2151.414. First, the juvenile court must find by clear and convincing evidence that one of the following conditions set forth in R.C. 2151.414(B)(1)(a) through (e) exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was

previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 43} In this case, CCDCFS moved for permanent custody under R.C. 2151.414(B)(1)(d), which provides that the child had been in agency custody for 12 or more months of a consecutive 22-month period. The trial court determined that this condition was satisfied, and Mother does not argue otherwise. Consequently, we need only to determine if permanent custody was in the best interest of children.

{¶ 44} Once the first prong is met, the juvenile court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1). "Clear and convincing evidence" is that measure or degree of proof that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, at ¶ 8. A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence "if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence." *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16.

{¶ 45} We review a juvenile court's determination of a child's best interest under R.C. 2151.414(D) for abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 46} In determining the best interest of a child at a hearing held pursuant to R.C. 2151.414(A)(1), the juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 47} A juvenile court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, but "[t]here is not one element that is given greater weight than the others pursuant to

the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.  This court has previously stated that only one of these enumerated factors needs to be resolved in favor of the award of permanent custody.  *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683, 621 N.E.2d 426 (3d Dist.1993).  Further, the Supreme Court of Ohio has clarified that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e).  Consideration is all the statute requires."  *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31.

{¶ 48} Upon careful review of the entire record, including the court's findings as outlined above, we do not find that the juvenile court abused its discretion in determining that permanent custody was in the children's best interest.

{¶ 49} R.C. 2151.414(D)(1)(a) relates to the interaction and interrelationship of the child with various significant individuals in the children's life, including parents, siblings, relatives, and foster caregivers.  There was testimony that the children were bonded with their Mother, but this bond was more of a "parent-friend" bond rather than a "parent-child" bond.  This court has previously noted, "'[T]he mere existence of a good relationship is insufficient.  Overall, we are concerned with the best interest of the child, not the mere existence of a relationship.'"  *In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-349, ¶ 23, quoting *In re R.N.*, 8th Dist. Cuyahoga No. 83121, 2004-Ohio-2560.

{¶ 50} Further, "[a] child's best interests require permanency and a safe and secure environment." *In re Holyak*, 8th Dist. Cuyahoga No. 78890, 2001 Ohio App. LEXIS 3105 (July 12, 2001). While in Mother's home, the children had been exposed to risks to their safety, including contact with sex offenders and perpetrators of domestic violence. While Mother argues that she should not be held responsible for the crimes of others, she is responsible for the people to whom her children are exposed.

{¶ 51} The record demonstrates that Mac.J., T.J., and I.W. had been placed in foster homes. There was testimony that their basic and special needs were being met and that they were comfortable with their foster families. T.W. had been AWOL until the day prior to trial. There was evidence that she had been with Mother at times during the AWOL period, but Mother continually failed to advise the agency of T.W.'s whereabouts until the day before trial.

{¶ 52} Under R.C. 2151.414(D)(1)(b), the juvenile court was to consider the children's wishes as expressed directly or through their GAL. The GAL stated in his report that Mother had missed many visits with the children over the three months prior to trial, that she had major mental health issues, and that she had been very uncooperative with the agency.

{¶ 53} The GAL stated that I.W. had expressed a desire to return to Mother and that he had a sense that T.W. did as well. The GAL further noted that T.J. and Mac.J. were not sufficiently mature to express their wishes in this regard. "The juvenile court properly considers the GAL's recommendation on the permanent-

custody motion as part of the R.C. 2151.414(D)(1)(b) analysis where the children are too young to express their wishes." *In re B/K Children*, 1st Dist. Hamilton No. C-190681, 2020-Ohio-1095, ¶ 45.

{¶ 54} The GAL ultimately recommended permanent custody of all of the children to CCDCFS.

{¶ 55} R.C. 2151.414(D)(1)(c) relates to the child's custodial history. There is no dispute that, at the time of trial, the children had been in the custody of the agency for twelve or more months of the previous twenty-two-month period.

{¶ 56} R.C. 2151.414(D)(1)(d) concerns the child's need for a legally secure placement and whether that can be achieved without a grant of permanent custody. The trial court in this case found that the children cannot be placed with one of their parents within a reasonable time or should not be placed with either parent. Specifically, the trial court made findings under R.C. 2151.414(E) including Mother's failure to remedy the problems that caused the children to be placed outside the home and her lack of commitment. "'Once a court determines, by clear and convincing evidence, that one of the enumerated factors exists, the court must enter a finding that the child cannot or should not be placed with either of his parents within a reasonable time.'" *In re R.A.*, 8th Dist. Cuyahoga No. 110541, 2021-Ohio-4126, ¶ 43, quoting *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000).

{¶ 57} Under R.C. 2151.414(D)(1)(e), the juvenile court was to consider whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 applied in

relation to Mother and the child. None of these factors appear to have been applicable to this matter, and Mother does not argue otherwise.

{¶ 58} The juvenile court's findings were all supported by the testimony presented at trial. Moreover, the court was guided by the recommendation of the GAL, who spoke on behalf of the younger children, and recommended that it was in the best interest of all four children to grant the agency permanent custody. The juvenile court did not abuse its discretion in finding that permanent custody was in the best interest of the children.

### III. Conclusion

{¶ 59} After thoroughly reviewing the entire record, we affirm the juvenile court's judgment granting permanent custody of the children to CCDCFS. The juvenile court's judgment was not against the manifest weight of the evidence, and Mother's sole assignment of error is overruled.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
MARY J. BOYLE, J., CONCUR